UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELSHONE MAJORS as Personal
Representative of the Estate of DAVID          Case No. 07-11330
EUGENE MAJORS, DECEASED,
                                               Honorable Nancy G. Edmunds
          Plaintiff,

v.

CITY OF DETROIT, ET AL,

          Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT [34, 35] AND ORDERING
DEFENDANT CITY OF DETROIT TO FILE A MOTION AND BRIEF ADDRESSING
PLAINTIFF'S REMAINING CLAIM OF MUNICIPAL LIABILITY**

     This § 1983 case comes before the Court on motions for summary judgment brought

by Michigan State Trooper Defendants Timothy Rajala, Richard Fell, and James Grady and

by Defendants City of Detroit and Detroit Police Officer Lavon Howell.  Plaintiff's complaint

against Defendants is brought pursuant to 42 U.S.C. § 1983 and alleges that Defendant

Troopers and Officer violated the decedent's Fourth and Fourteenth Amendment rights by

using deadly force and by being deliberate indifferent to his serious medical needs after

shooting him.  The complaint further alleges that Defendant City of Detroit is liable because

its policies, practices and customs were a direct and proximate cause of the alleged

constitutional violations.

     Defendants' motions for summary judgment are GRANTED IN PART and DENIED IN

PART.  Defendants' motions are GRANTED as to Plaintiff's Fourteenth Amendment claims

against Defendant Officers alleging that they were deliberately indifferent to Majors' serious medical needs.  Because there is no Fourteenth Amendment violation, Defendant City's motion is GRANTED as to Plaintiff's claim of municipal liability arising from this alleged constitutional violation.   Defendants' motions are DENIED as to Plaintiff's Fourth Amendment claim for the unreasonable use of deadly force against Defendant Officers because questions of fact remain for trial on that claim.  As to Plaintiff's claim of municipal liability against Defendant City of Detroit arising from this alleged Fourth Amendment violation, Defendant City's motion is DENIED WITHOUT PREJUDICE.  Defendant City of Detroit is HEREBY ORDERED to file a motion for summary judgment and fully brief this claim of municipal liability on or before **August 24, 2009** so that the matter may be addressed before trial.

I.     **Facts**

This case arises from the undisputed fact that, on August 29, 2004, the three Defendant State Troopers in this case and Defendant Detroit Police Officer (collectively, "Defendant Officers") fired shots at decedent, David Majors.  The shots were fired after Majors' car crashed on westbound I-94 in Detroit near Livernois, ending a police pursuit that began with Majors fleeing from a  traffic stop.

The pursuit leading up to Defendants use of deadly force is not at issue in this federal action.[1]   Rather, Plaintiff's Fourth Amendment claim addresses Defendant Officers' use of

---

[1]This Court declined to exercise jurisdiction over Plaintiff's state law claims, dismissing them without prejudice.  (Doc. No. 2, 4/19/07 Order.)  Plaintiff's federal complaint was filed on March 27, 2007.  Earlier, in October 2005, Plaintiff had filed state law claims in Wayne County Circuit Court against the individual Defendants alleging gross negligence and assault and battery.  Plaintiff's gross negligence claim in that state court action addresses the police pursuit.  (Defs.' Reply, Ex. 5 at ¶ 19.)  There are no allegations asserting an

deadly force after Majors' taxi cab came to rest on I-94.  Defendant Officers testified that they fired shots at Majors when he pointed a gun or guns at one or more of them.

State Trooper Fell saw Majors with two guns; a revolver and a semi-automatic pistol. Brandishing a gun in each hand, Fell saw Majors first point both guns at his head.  Next, he saw Majors moving around in his taxi, trying to get the driver door open.  Trooper Fell then saw Majors point both guns at him and the other officers.  (Fell Dep. at 55-56, 63-66, 79.)  Trooper Grady (Trooper Fell's partner at the time) saw Majors with one gun; a black, semi-automatic handgun, which he held in his left hand.  Grady saw Majors put the semi-automatic gun to his left temple.  Shortly after putting the gun to his temple, Grady saw Majors move the gun and point the barrel at him and the other officers on the scene. (Grady Dep. at 43-55, 58, 61.)  Trooper Rajala saw Majors with one gun, but could not recall if it was a revolver or a semi-automatic.  He saw a gun in Majors' right hand.  Majors first had the gun pointed at his right temple, and then he aimed it at Trooper Rajala and the other officers while attempting to get out of his taxi.  (Rajala Dep. at 73, 82-86, 96-97, 012, 105-06, 117, 123-25.)  Detroit Police Officer Howell also saw Majors with one gun; a blue steel, grayish-colored revolver.  Howell saw Majors try to get out of his taxi.  Majors then pointed his gun at Officer Howell and the other officers.  (Howell Dep. at 60, 98, 101-04, 109, 111-120, 129-131, 142.)

Troopers Ball and Jeffries, two other Michigan State Troopers who were at the scene, testified that they stopped their vehicles in front of the taxi that Majors had been driving. Neither fired a shot at Majors.  Although their testimony does not conflict with Defendant

---

excessive force claim arising from the police pursuit in this federal action against Defendants.

Officers' testimony that the suspect had a gun and pointed it at them, they do testify that they did not see Majors with a handgun.  (Ball Dep. at 38-72; Jeffries Dep. at 10-33.)

The remaining officers on the scene testified that, although they did not fire shots at Majors, they did see him with a gun.  Detroit Police Office Diandre Pitts testified that Majors pointed a blue or black .38 revolver at Pitts.  Officer Pitts also saw the evidence technicians pull two guns from the taxi Majors was driving after Majors was removed and taken to the hospital.  One was a revolver, and the other one looked like a semi-automatic.  (Pitts Dep. at 36-42, 44, 50, 56, 66-75.)  Pitts' partner, Detroit Police Officer Brandon Binion, also saw Majors with a firearm.  Binion testified that Majors had the firearm in his left hand, pointing it at his own head.  Binion could not tell what type of gun it was; only that it was dark in color.  After Officer Binion saw Majors with a gun in his hand, Binion retreated and took cover and did not see anything else.  Officer Binion crouched down behind a car bumper when he first heard shots.  He was not looking at Majors at that time and did not see him point a gun towards anyone.  After Binion heard shots, he saw Michigan State Troopers taking Majors out of the taxi to aid him.  At that point, Binion approached the taxi.  Within a few minutes after the shooting stopped and Majors was taken to the hospital, Officer Binion saw a gun on the driver's seat side of the taxi Majors had been driving, but he could not say whether it was the same gun he saw in Majors' hand.  The evidence technicians were on the scene when Officer Binion saw the gun.  He believes there were two guns in the taxi because he saw the evidence technicians take a second gun out of the taxi. (Binion Dep. at 65, 82-88, 90, 92-93, 96, 99-109, 115-16, 119-20.)

Michigan State Trooper Phillip Duplessis was also on the scene.  He testified that he came on the scene after shots had already been fired.  He immediately took cover.  He

4

does not recall seeing a gun in Majors' hand.  After the shooting, Defendant Troopers

Grady and Fell told him that they fired shots so he secluded them in a patrol car.  Again,

after the shooting, he looked through the taxi window and saw a revolver on the floor to the

right of the hump that divides the driver and passenger front seats and within easy access

of the driver.  He started taking pictures of the scene.  He saw only one gun but looked

through the window at both the front and back seats.  He saw lots of clutter in the cab, and

took photos of what he could while leaning through the window. (Duplessis Dep. at 11, 13-

15, 19-20, 22-23, 25-26, 28, 34, 36.)  Duplessis's partner, Michigan State Trooper Jonathan

Henry, testified that he arrived on the scene as Michigan State Troopers and Detroit Police

Officers were taking cover.  He did not take any photos; his partner did.  He saw Majors in

the cab with both feet outside and his torso and head inside the taxi towards the driver's

floor board.  He did not see the suspect's hands or arms.  He, along with Trooper Rajala

and a Detroit Police Officer, pulled Majors out of the taxi.  Trooper Henry saw a gun in the

taxi later; not at the time of removal.  Within minutes after Majors was removed from the

taxi, Troopers Henry and Duplessis saw an older model revolver on the right passenger

floorboard of the cab's front seat.  While on the scene, he head that Majors had two guns

in his hand, but Trooper Henry only saw one gun.  Trooper Henry also talked to a witness;

Canadian truck driver James Patterson. (Dep. at pp. 6, 8, 11, 13-16, 19-20, 22-23, 25-28,

31-35.)

A Detroit Police Department evidence technician report from the fatal shooting on

August 29, 2004 provides that an "inventory search of the taxi was conducted by Sergeant

Babcock before transport." (Pl.'s Ex. M, 8/29/04 Evid. Tech. Report at 3.)  That search

revealed that:

5

The taxi has front end and drivers side rear accident damage.  Two hand guns were recovered from the taxi.  One (1) a ITERARMS, Star model, 9MM semi-auto pistol with 9 rounds in the clip, and 1 round in the barrel and the hammer cocked.  The second handgun is a TAURUS, 38 caliber revolver, serial number 1197291, with 6 live rounds in the cylinder.  There are approximately nine (9) suspected bullet impacts to the exterior of the vehicle.

(*Id.* at 3-4.)

A signed witness statement was provided by truck driver Jason Patterson.  The statement was taken by Detroit Police Investigator King.  (Defs.' Reply Ex. 7, 8/29/04 Witness Statement.)  Patterson stated that he entered I-94 from the I-96 entrance.  He had come from the Ambassador Bridge.  He saw police cars and thought that they were escorting someone.  All of a sudden the traffic stopped, the taxi cab went sideways and cars were all over the road.  He sat there and looked.  "The two officers on the right had their backs turned then the gun shot went off.  Then a whole bunch of shots went off.  There was a pause then more shots."  (*Id.*)  He stated that he could not tell who fired the first shot or where it came from.  Rather, he stated, "all I saw was police officers. . . . Detroit and State." (*Id.*)  In response to the question whether he saw "the man who got out of the cab with a gun," Patterson replied "No."  (*Id.*)

In opposition to Defendants' motions for summary judgment, Plaintiff presents Jason Patterson's affidavit.  Mr. Patterson avers the following.  He is 37 years old and resides at 507 Woodbend Road, SE Calgary, Alberta, Canada.  On Sunday evening, August 29, 2004, he drove his truck onto westbound I-94 from the westbound I-96 entrance.  Upon entering westbound I-94, he observed a caravan of State Police and Detroit Police vehicles passing him, traveling westbound at about 50 mph.  At first, he thought the police vehicles were engaged in some sort of official escort.  He then realized that the police vehicles were

pursuing a white taxi-cab.  The white taxi-cab vehicle never swerved into or hit a police vehicle during the pursuit.  He observed a State Police vehicle ram into the white taxi-cab causing the front driver's side corner of the police vehicle to impact with the rear passenger's corner of the taxi-cab.  The impact caused the white taxi-cab to spin out of control and collide into the right shoulder wall.  After bouncing off the right shoulder wall, the cab came to a final stop and appeared to be inoperable as it straddled the right shoulder and right lane of westbound I-94 just east of Livernois.  (Pl.'s Ex. K, Patterson Aff. at ¶¶ 1-9.)

Patterson was able to safely stop his truck just a few car lengths behind the white taxi-cab.  A couple police vehicles were in front of him.  Because the front of the taxi-cab was pointed south, he was able to observe the entire driver's side of the white taxi-cab which was illuminated by the street lights and the headlights of the police vehicles.  From the elevated vantage point of his truck driver's seat, Patterson was able to observe the cab driver -- an African American male -- through the front driver's side window area of the taxi-cab.  The cab driver was seated in the driver's seat of the taxi-cab while several officers were yelling.  Shortly thereafter, Patterson heard several gunshots, at which point he took cover.  During his entire observation of the cab driver, including from the moment the cab first came to rest up through the time Patterson heard gunshots, he never observed the cab driver holding or possessing a gun, weapon, or other object.  He never observed the cab driver holding or pointing a gun or other object to his head.  Because of the lighting conditions, his vantage point, and his close proximity to the incident, he would have been able to observe it if the cab driver had held or pointed a gun or other object to his head.  Patterson made no such observation.  He did not observe the cab driver discharge a

firearm, and Patterson did not believe that the cab driver presented an imminent risk of serious physical harm to him or others.  (Patterson Aff. at ¶¶ 10-18.)  After the shooting, the police ordered Patterson to stay inside his truck.  He did so until the officers concluded their forensic scene investigation, which included the police placing markers on the fender of his truck, the police taking photographs of his truck, and the police taking measurements from his truck.  (*Id.* at ¶ 19.)

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

### A.  Excessive/Deadly Force - Fourth Amendment Violation

Plaintiff asserts that Defendants violated Majors' Fourth Amendment rights when they shot and killed him.  Defendants argue in their motions for summary judgment that they are entitled to qualified immunity.  In a very recent decision, the Sixth Circuit addressed a similar argument in the context of a § 1983 excessive force case.  *See Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009).  It began, as this Court does, with a discussion of the doctrine of qualified immunity and how the Court determines whether a defendant is entitled to the protection afforded by that doctrine.

The doctrine of qualified immunity shields "'government officials performing discretionary functions'" from "'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* at 309 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  On summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party; Plaintiff in this case.  Viewing the facts in that light, the Court must then determine "whether:  1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of defendant's alleged misconduct."  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and citing *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004)).  Although the Supreme Court, in *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 818 (2009), recently held that the courts now have

discretion to address the second step first when appropriate, this Court, similar to the Sixth Circuit in *Grawey v. Drury*, will first examine whether Plaintiff "has presented evidence of an excessive force constitutional violation and then whether the constitutional violation was clearly established at the time of the incident." *Grawey*, 567 F.3d at 309.

"In step one of the qualified immunity analysis, the court determines whether this evidence, produced by plaintiff, taken in the light most favorable to plaintiff but viewed from the perspective of a reasonable officer on the scene, establishes a claim of excessive force in violation of the Constitution." *Id.* If an excessive force claim is established, the Court proceeds to the second step. At this step, the Court must determine whether the violated constitutional right was clearly established at the time of the alleged misconduct. *Id.*

"The proper approach under Sixth Circuit precedent is to view excessive force claims in segments. That is, the court should first identify the seizure at issue here and then examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances" which "required the use of deadly force." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (internal quotation marks and citations omitted). Plaintiff alleges one instance of excessive force in violation of the Fourth Amendment -- that Defendant Officers used excessive force when they shot and killed Majors.

## 1. General Principles

As the Supreme Court observed in *Tennessee v. Garner*, "apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. 1, 7 (1985). The Sixth Circuit "assesses the reasonableness of a seizure in distinct stages." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).

"[W]hether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at the moment.  The assessment must be made from the perspective of a reasonable officer in the defendant's position."  *Id.* "That objective assessment" of the danger the suspect posed at the moment deadly force was used "requires asking whether the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  *Id.* (internal quotation marks and citation omitted).  When applying this "probable cause" standard, the Sixth Circuit considers the following non-exhaustive factors:  "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  The officer's belief that the suspect possesses a weapon is not enough to justify the use of deadly force.  *Id.* at 896.  As the Sixth Circuit explained, "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified."  *Id.* (citing cases).

### 2.  Plaintiff's Version of Facts Shows a Constitutional Violation

Taking the evidence in the light most favorable to Plaintiff while also viewing it from the perspective of a reasonable officer on the scene, Plaintiff's evidence creates a genuine issue of material fact whether Defendant Officers lacked probable cause to believe that Majors posed a serious threat of danger to them or to the public when he was shot.  Even though Majors had earlier fled from Defendants, there is witness testimony that, when confronted by the police after his taxi crashed on I-94, his gestures were not threatening;

he did not hold or possess a gun, weapon, or other object; and he never held or pointed a gun or other object to his head.  (Patterson Aff. at ¶¶ 13-18.)

Although a genuine issue of material fact exists on Plaintiff's excessive force claim against Defendant Officers' use of deadly force, Plaintiff must also satisfy the second step of the qualified immunity analysis by showing that Majors' Fourth Amendment rights were clearly established at the time he was shot.  *Grawey*, 567 F.3d 309.

### 3.  Majors' Constitutional Rights Were Clearly Established

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.  To determine whether a constitutional right is clearly established, this Court looks "first to decisions of the Supreme Court," then to decisions of the Sixth Circuit, "and finally to decisions of other circuits." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005).  "[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Id.* (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to Plaintiff, no reasonable officer could have thought that he had probable cause to use deadly force against Majors.  Based on the case law that existed on August 29, 2004, when Majors was shot, Defendant Officers were on notice that their actions were unconstitutional.  "[T]he Supreme Court has recognized that there are obvious cases in which an officer should have been on notice that his conduct violated constitutional rights, despite the generalized nature of that Court's pronouncements of constitutional standards." *Bouggess*, 482 F.3d at 895.  Moreover, the

12

Sixth Circuit established, in *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996),

that despite "uncontroverted evidence of serious danger to officers stemming from the

suspect's clear possession of a weapon, his recent firing of his weapon, and his threatening

language toward the police," the officers were not entitled to qualified immunity because

immediately before the shooting, "it was disputed whether the suspect was non-threatening

*when he was shot.*" *Bouggess*, 482 F.3d at 895. Here too, it is disputed whether Majors

was a threat to the police or others when he was shot.

For the above-stated reasons, Defendants' motions for summary judgment are

DENIED as to Plaintiff's Fourth Amendment excessive force claims against Defendant

Officers. Genuine issues of material fact exist for trial on the reasonableness of Defendant

Officers' use of deadly force on Majors.

**B.  Deliberate Indifference to Serious Medical Needs - Fourteenth Amendment**

Defendants next argue that they are entitled to summary judgment on Plaintiff's claim

that they were deliberately indifferent to Majors' serious medical needs after he was shot,

thus violating his Fourteenth Amendment rights. Defendants present evidence that they

were not deliberately indifferent to Majors' medical needs after he was shot, that EMS was

immediately called, and Majors was treated on the scene and taken to the hospital without

any undue delay. Because Plaintiff has failed to come forward with any evidence refuting

this evidence, Defendants' motions as to Plaintiff's Fourteenth Amendment claims are

GRANTED.

**C.  Municipal Liability**

Plaintiff's complaint also alleges a claim of municipal liability against the City of Detroit

for (1) failing to properly screen, supervise, discipline, transfer, counsel, or otherwise

control police officers, like Defendant Officer Howell, who are known to or should have been known to engage in the improper use of excessive and deadly force; (2) ratifying acts of improper use of force, including deadly force with knowledge of their illegality, including such acts by Defendant Officer Howell in the past; (3) having a police code of silence wherein other officers and supervisors habitually cover up use of excessive and deadly force by fabricating accounts to the media and in official reports and internal affairs investigations, all of which are designed to falsely exonerate officers from potential criminal and civil liability; and (4) having a *de facto* policy of failing to screen, discipline, supervise, counsel, transfer, and/or control errant officers.  (Pl.'s Compl. at ¶¶ 23-25.)  In opposition to Defendants' motions for summary judgment, Plaintiff submits portions of the Detroit Police Department's Report of its final administrative review of the fatal shooting of Majors. (Pl.'s Ex. Q, 8/4/05 Report.)  The portions submitted, however, do not address Defendant Officers' conduct in the fatal shooting.  (*Id.*)  Another report of the homicide scene investigation, prepared by Police Officer Charles D. Zwicker, is submitted by Plaintiff.  (Pl.'s Ex. R.)  That report details the location and condition of the white cab after the shooting, the exterior scene on the freeway, the location of Michigan State Police and Detroit Police vehicles on the scene, the location of bullet strikes, spent casings, officer statements that Majors had pointed a hand gun out the drivers window as he attempted to open the door, that police technicians gathered evidence, and that officers who reported firing their weapons; i.e., Defendant Officers Howell, Fell, Rajala, and Grady.  The report concludes with the statement that "[t]his appears to be a justified shooting at this time and should be considered closed."  (*Id.* at 4.)

Defendant City argues that it is entitled to summary judgment on this municipal liability claim because there were no constitutional violations.  Defendant's argument is partially correct.

Plaintiff's municipal liability claims do not appear to address the Fourteenth Amendment claim of deliberate indifference to serious medical needs.  To the extent Plaintiff is asserting such a claim for municipal liability, it is dismissed.  Before a municipality may be held liable under § 1983, a constitutional violation must have occurred. *See* 42 U.S.C. § 1983.  As discussed above, Plaintiff has failed to establish that Defendant Officers violated Majors' Fourteenth Amendment rights by being deliberately indifferent to his serious medical needs.  Thus, Defendant City of Detroit cannot be held liable on that claim, and Defendant's motion is GRANTED as to municipal liability on the Fourteenth Amendment claim.

The municipal liability claims asserted in Plaintiff's complaint focus solely on Defendant Howell's alleged Fourth Amendment violation for the use of deadly force. Defendant City, however, fails in its motion for summary judgment to address this claim. Specifically, Defendant City has failed to address whether Plaintiff can present sufficient evidence such that a reasonable juror could find that the City of Detroit had a policy or practice of inadequately investigating or otherwise ratifying its police officer's use of excessive force.  A municipality's failure to investigate constitutional deprivations and to discipline offending officers appropriately can ratify the misconduct, giving rise to liability under 42 U.S.C. § 1983.  *See, e.g., Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). But to make out such a claim, "the plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'"  *Gregory v.*

15

*City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of County Comm'rs v.*

*Brown*, 520 U.S. 397, 407 (1997)); *see also McClendon v. City of Detroit*, 255 F. App'x 980,

983 (6th Cir. 2007) (applying "deliberate indifference" standard to ratification claim); *Black*

*v. City of Memphis*, No. 98-6508, 2000 WL 687683, *3-*4 (6th Cir. May 19, 2000) (same).

In light of the above, Defendant City's motion for summary judgment on Plaintiff's

municipal liability claim arising from the alleged Fourth Amendment violation for using

deadly force is DENIED WITHOUT PREJUDICE, and Defendant City is HEREBY

ORDERED to file a motion for summary judgment and fully brief this claim of municipal

liability on or before **August 24, 2009** so that the matter may be addressed before trial.

## IV.   Conclusion

For the above-stated reasons, Defendants' motions for summary judgment are

GRANTED IN PART and DENIED IN PART.   Defendants' motions are GRANTED as to

Plaintiff's Fourteenth Amendment claims against Defendant Officers alleging that they were

deliberately indifferent to Majors' serious medical needs.   Because there is no Fourteenth

Amendment violation, Defendant City's motion is GRANTED as to Plaintiff's claim of

municipal liability arising from this alleged constitutional violation.   Defendants' motions are

DENIED as to Plaintiff's Fourth Amendment claim for the unreasonable use of deadly force

against Defendant Officers because questions of fact remain for trial on that claim.   As to

Plaintiff's claim of municipal liability against Defendant City of Detroit arising from this

alleged Fourth Amendment violation, Defendant City's motion is DENIED WITHOUT

PREJUDICE.   Defendant City of Detroit is HEREBY ORDERED to file a motion for

summary judgment and fully brief this claim of municipal liability on or before **August 24,**

**2009** so that the matter may be addressed before trial.


                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  July 31, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record
on July 31, 2009, by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer
                    Case Manager